IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | Case No. 04 CR 884 |
| ) | |
| MIGUEL MEDRANO-DURAN ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Miguel Medrano-Duran pled guilty to a one-count indictment charging him with illegal re-entry after deportation due to commission of an aggravated felony in violation of 8 U.S.C. § 1326(a). On August 4, 2005, the Court sentenced Medrano-Duran to a term of forty-one months imprisonment, which was below the advisory Sentencing Guidelines range of fifty-seven to seventy-one months. The purpose of this Memorandum Opinion is to explain the Court's imposition of a sentence outside the advisory range.

### Facts

The presentence report reflects that Medrano-Duran was twenty-three years old at the time of the offense. When he was sixteen, in or around 1997, Medrano-Duran left his home in Mexico and came to this country. He worked a variety of jobs for temporary service agencies. In 2000, at age nineteen, he was convicted of criminal trespass to a vehicle, pled guilty, and was given a sentence of one year conditional discharge (a form of non-reporting probation). In 2001, at age twenty, Medrano-Duran several other individuals forcibly took a wristwatch from the victim and ran off when a witness told them to leave the victim alone. He was charged with robbery, pled guilty, and was sentenced to a term of 180 days in the Cook County Jail. Later that

same year, while still twenty years old, Medrano-Duran approached an unlocked vehicle, yelled at the occupant (who was sleeping) to give him his money, and then grabbed the victim's bag. He was charged with burglary from a motor vehicle and theft, pled guilty, and received a sentence of unknown length, served in a "boot camp" facility run by the Cook County Department of Corrections.

Medrano-Duran was deported to Mexico in January 2004. In October 2004, he was found in Mount Prospect, Illinois and was arrested for illegal re-entry. There is no indication that he committed any other crimes upon his return.

Following indictment, Medrano-Duran filed no pretrial motions and ultimately pled guilty in April 2005. This is Medrano-Duran's first and only illegal re-entry offense.

Medrano-Duran's parents and several of his siblings live in Mexico. He has three older siblings who live in Illinois. Medrano-Duran is married to a woman who still lives in Mexico and has two young children, who Medrano-Duran says he plans to support. As indicated earlier, while in the United States, he was gainfully employed, working for various temporary service agencies.

Based on Medrano-Duran's Sentencing Guidelines criminal history category of IV and his offense level of twenty-one, the advisory Guideline sentencing range was fifty-seven to seventy-one months. Medrano-Duran sought a sentence below this range, arguing that the unavailability in this District of an early disposition or "fast track" program for persons charged with illegal re-entry created an unwarranted sentencing disparity that the Court should take into account.

Fast track programs for illegal re-entry cases have existed for a number of years in some

districts, primarily districts on the Mexican border with a large number of illegal re-entry cases. Generally speaking, prosecutors in those districts have agreed to significantly reduced sentences in exchange for prompt guilty pleas. The purpose of these programs was and is to facilitate prompt and easy disposition of cases to reduce the burdens they impose in those districts – there was not enough physical space to house detained defendants, and there were not enough prosecutors to handle all the cases brought to them.

During the period when the Sentencing Guidelines were understood to be mandatory in their application, several Circuits held that the existence of early disposition programs in some districts did not warrant a departure from the Guideline sentencing range for defendants in other districts. *See, e.g., United States v. Armenta-Castro*, 227 F.3d 1255, 1257-60 (10th Cir. 2000); *United States v. Banuelos-Rodriguez*, 215 F.3d 969, 972-78 (9th Cir. 2000) (en banc); *United States v. Bonnet-Frullon*, 212 F.3d 692, 697-710 (2d Cir. 2000). The Courts in these cases ruled that the Guidelines proscribed consideration of sentencing disparities that resulted from the exercise of prosecutorial discretion. *See, e.g., Armenta-Castro*, 227 F.3d at 1258.

Since *United States v. Booker*, 125 S.Ct. 738 (2005), however, the Sentencing Guidelines are no longer mandatory in their application. As a result of this change in the law governing sentencing, the pre-*Booker* decisions reference above that rejected departures from the then-mandatory Guideline range on the ground the Guidelines precluded such departures certainly cannot be ignored, but they can no longer be considered controlling law.

Pursuant to *Booker*, courts are to determine sentences pursuant to the factors set forth in 18 U.S.C. § 3553(a). Section 3553(a) directs a court to impose a sentence that is sufficient, but not greater than necessary, to comply with certain statutory purposes, including the need for the

3

sentence to reflect the seriousness of the crime; promote respect for the law; provide just punishment; afford adequate deterrence; protect the public from further crimes by the defendant; and provide the defendant with needed training, medical care, or correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). In considering the particular sentence to be imposed, a court is to consider those same factors, as well as the nature and circumstances of the offense; the history and characteristics of the defendant; the kinds of sentences available; the sentencing range under the Sentencing Guidelines; any pertinent policy statements by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and the need to provide restitution to victims of the crime. *Id.* § 3553(a)(1) - (7).

Medrano-Duran argues that the unavailability of an early disposition program in this District gives rise to an unwarranted disparity that the Court should take into account pursuant to § 3553(a)(6). The government's primary argument against giving Medrano-Duran a departure is that the disparity cannot be considered unwarranted, because Congress has specifically approved the institution of fast track programs at the discretion of the Attorney General.

In 2003, Congress adopted the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003, otherwise known as the "PROTECT Act." Section 401(m)(2)(B) of the PROTECT Act directed the Sentencing Commission to –

promulgate, pursuant to section 994 of title 28, United States Code--

...

(B) a policy statement authorizing a downward departure of not more than 4 levels if the Government files a motion for such departure pursuant to an early disposition program authorized by the Attorney General and the United States Attorney ....

Pub. L. 108-21, § 401(m)(2)(B). The Sentencing Commission did so, adopting the following policy statement in October 2003:

> <u>Early Disposition Programs</u> (Policy Statement)
>
> Upon motion of the Government, the court may depart downward not more than 4 levels pursuant to an early disposition program authorized by the Attorney General of the United States and the United States Attorney for the district in which the court resides.

U.S.S.G. § 5K3.1.

Based on the parties' submissions, it appears that fast track programs authorized by the Attorney General for illegal re-entry cases exist in thirteen districts. A number of these are in southwestern border states: the District of Arizona, the Northern, Eastern, Central, and Southern Districts of California; the District of New Mexico; the Southern District of Texas; and some divisions of the Western District of Texas. But the Attorney General has also approved early disposition programs in other districts, specifically the Districts of Oregon, Idaho, Nebraska, and North Dakota, and the Western District of Washington.

The Northern District of Illinois does not have an early disposition program for illegal re-entry cases. The Court inquired of the prosecutor at sentencing whether this was because the United States Attorney's Office for this District had not sought approval for a program of this type, or rather because it was turned down after seeking approval. The prosecutor did not provide an answer to this question, though his comments suggested that no application had been made by the local Office.

The Court seriously questions whether a sentencing disparity among defendants in different districts that results from application of a policy statement adopted by the Sentencing Commission, pursuant to an express Congressional directive, could appropriately be considered

5

"unwarranted" within the meaning of § 3553(a)(6). On the one hand, § 3553(a)(6) imposes no express limitation on the types of disparities that may be deemed unwarranted. But by the same token, the considered views of our Nation's elected representatives are certainly entitled to significant weight in assessing the issue. If the disparities relied upon by Medrano-Duran were limited to those created by fast track programs of the type that received Congress' imprimatur in the PROTECT Act, the Court likely would be disinclined to consider the disparities unwarranted.

The Court need not determine that issue, however, to address Medrano-Duran's disparity argument. Based on the parties' submissions, there are a significant number of districts with early disposition programs that operate outside the bounds of the PROTECT Act and § 5K3.1. The government's submission reflects that there are two distinct types of fast track programs: those which, consistent with § 5K3.1 and the Congressional directive, rely on downward departures of up to four levels, and those which rely on charge-bargaining, in other words, where the defendant is permitted to plead guilty to a reduced charge.

The fast track districts that rely on charge-bargaining use methodologies that permit far greater sentence reductions that contemplated by Congress' directive in the PROTECT Act and the Sentencing Commission's policy statement in § 5K3.1. In at least five of the fast track districts (the Northern, Central, and Southern Districts of California, the District of Oregon, and the Western District of Washington), persons charged with illegal reentry under 8 U.S.C. § 1326 are permitted to plead guilty to two counts of improper entry under 8 U.S.C. § 1325. The effect is to limit the sentence to thirty months' imprisonment: the first offense under § 1325 carries a six month maximum prison sentence, and the second offense carries a twenty-four month

6

maximum.[1]

Charge-bargaining in these districts can, in many cases, result in a sentence reduction that significantly exceeds that which the defendant would receive if he were limited to the four-level maximum departure authorized by Congress in the PROTECT Act and by the Sentencing Commission in § 5K3.1. This can be illustrated by reference to Medrano-Duran's case. Medrano-Duran's criminal history category is IV, and his total offense level is twenty-one, yielding a range under the Guidelines of fifty-seven to seventy-one months. A one-level downward departure as provided in the departure-based early disposition program of some divisions of the Western District of Texas would reduce his range to fifty-one to sixty-three months. A two-level downward departure, as provided in the departure-based fast track programs in the Districts of New Mexico, Nebraska, and Idaho, as well as the Southern District of Texas and some divisions of the District of Arizona, would reduce his range to forty-six to fifty-seven months. A three-level downward departure, as provided in the program in effect in other divisions of the District of Arizona, would reduce his range to forty-one to fifty-one months. A four-level downward departure, as provided in the departure-based fast track programs in the Eastern District of California and the District of North Dakota, would reduce his range to thirty-seven to forty-six months. Each of these programs falls within the scope of Congress' mandate and the Sentencing Commission's policy statement. But in the charge-bargaining districts referenced earlier, Medrano-Duran's sentence would be thirty months –

---

[1] According to the government's submission, the fast track program in the Southern District of California requires a defendant whose Sentencing Guidelines offense level is twenty-one or greater and whose criminal history category is V or greater to plead guilty to three counts under § 1325 and agree to a forty-eight month sentence.

seven to sixteen months lower than the most lenient of the programs that can be said to carry the Congressional imprimatur.

Charge bargaining, of course, involves the exercise of prosecutorial discretion, a proper and essential element of our criminal justice system. *See, e.g., Wayte v. United States*, 470 U.S. 598, 607 (1985). This discretion stems from the Executive Branch's constitutional responsibility to "take care that the laws be faithfully executed," U.S. Const., Art. II, § 3. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996). Prosecutorial decisions in the exercise of this discretion are entitled to a presumption of regularity; "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Id.* (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)).

For this reason, this Court has no quarrel whatsoever with the Department of Justice's decision to authorize fast track programs that provide sentence reductions that can significantly exceed what Congress authorized in the PROTECT Act. But in assessing whether the sentencing disparity created by early disposition programs is warranted, prosecutorial charging decisions of this type, even those approved at the highest level, cannot possibly carry the same weight as Congressional directives. The Court rejects the government's argument to the contrary. There is nothing in § 3553, *Booker*, or any other existing authority to support a construction of § 3553(a)(6) that allows Congress and prosecutors to determine what sentence disparities are warranted and unwarranted but prevents a court from doing so.

If, for example, prosecutors were to determine as a matter of policy to handle all theft of government property cases under 18 U.S.C. § 641 by permitting defendants to plead guilty to a statutory misdemeanor, thus capping their sentence at one year, a particular defendant who was

8

similarly situated to the others but fortuitously was not offered such a bargain would have a strong claim that the resulting disparity was unwarranted. A similar fortuity exists in Medrano-Duran's case. Medrano-Duran is situated similarly to illegal re-entry defendants in, say, the Western District of Washington, but due to the fortuity of where he was found by the authorities after illegally returning to the United States, under the government's argument he is or should be stuck with a Guideline-determined sentence.

As other judges have stated, "[i]t is difficult to imagine a disparity less warranted than one that depends on the judicial district where the defendant happens to be found." *See United States v. Galfez-Barrios*, 355 F. Supp. 2d 958, 963 (E.D. Wis. 2005) (quoting *United States v. Bonnet-Grullon*, 53 F. Supp. 2d 430, 435 (S.D.N.Y. 1999)). If fast track programs were limited to districts that are swamped by illegal re-entry cases, a decent argument perhaps could be made that Medrano-Duran is not similarly situated to persons charged in those districts. But even though this may once have been the case, it is no longer. Based on the government's submission in this case, the Attorney General has approved early disposition programs in the Districts of Oregon, Idaho, Nebraska, and North Dakota, in which each Assistant United States Attorney, on average, handles only two or three illegal re-entry cases per year. And an early disposition program was also approved in the Western District of Washington, which has less than one illegal re-entry case per prosecutor per year – 0.58 cases per prosecutor, to be exact, for the fiscal year 2003. *See* Govt. Supp. Resp. at 7 (citing data from http://www.ussc.gov/LINKTOJP.HTM). It would be difficult to describe the illegal re-entry caseload in those districts as unduly burdensome, let alone overwhelming.

The government also argues that Medrano-Duran is not similarly situated to defendants in

fast track districts because he did not give up his right to appeal or his right to file pretrial motions, as defendants in those districts are required to do in order to be eligible for fast track disposition. But it hardly makes sense to penalize Medrano-Duran for failing to meet the requirements of a program that was never available to him. In any event, Medrano-Duran filed no pretrial motions, and at the time of sentencing he affirmed that he would not take an appeal. Though the Court did not base its sentencing decision on that affirmation, Medrano-Duran's willingness to give up his right to appeal tends to undercut the argument that he is situated differently from defendants in fast track districts.

Finally, the government argues that giving a particular defendant like Medrano-Duran a lower sentence creates more disparity, not less, because it makes sentences differ among judges in a particular district. But whether this creates more or less disparity depends on one's frame of reference. Reduction of a sentence for a defendant in a non-fast track district tends to reduce disparity when viewed on a national level. And in any event, the parties' submissions reflect that as many as five other judges in this District have likewise given below-Guidelines sentences based on the type of sentencing disparity that we have addressed in this Memorandum Opinion.

For these reasons, the Court determined that the disparity between Medrano-Duran and illegal re-entry defendants in districts with early disposition programs was an unwarranted disparity among similarly situated defendants within the meaning of § 3553(a)(6). In imposing sentence, the Court reduced Medrano-Duran's advisory Guideline range by three offense levels, which appeared to be the average of the departures given in districts whose early disposition programs are departure-based as provided in the PROTECT Act and § 5K3.1. That reduced Medrano-Duran's range to forty-one to fifty-one months, a range that the Court found to be

sufficient, but not greater than necessary, to meet the purposes of § 3553(a)(2). In imposing the particular sentence, the Court considered Medrano-Duran's personal characteristics, including his youth, the fact that he had no prior illegal re-entry offenses, and the fact that he committed no other crimes following his return to this country in 2004. The Court imposed a sentence of forty-one months imprisonment, followed by a term of supervised release including a requirement that Medrano-Duran be surrendered to immigration officials for deportation, and that if deported, he remain outside the United States.[2]

MATTHEW F. KENNELLY
United States District Judge

Date: August 11, 2005

---

[2] Another return by Medrano-Duran would, of course, constitute a criminal offense under § 1326. However, including non-return as a condition of supervised release leaves him open to the possibility of revocation and re-sentencing, in addition to a new § 1326 prosecution, if he returns to this country again after being deported.

11